**M.K. METALS, INC., Plaintiff,**

v.

**NATIONAL STEEL CORP., Defendant.**

**No. 79 C 1661.**

United States District Court,
N.D. Illinois, E.D.

Sept. 5, 1984.

Russell J. Barron, Cook Wetzel & Egan, Chicago, Ill., for plaintiff.

Juris Kins, Chadwell & Kayser, Chicago, Ill., Clyde W. Armstrong, Thorp, Reed & Armstrong, Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

M.K. Metals, Inc. ("M.K.") has asked that I recuse myself under 28 U.S.C. § 455 ("Section 455"). For the reasons set forth in this memorandum opinion and order, M.K.'s request is denied.

### Facts

In response to one of the inquiries posed by this Court's form of final pretrial order, National Steel Corp. ("National") announced it would call as an expert witness Professor Dennis Carlton, a senior economist and principal at Lexecon, Inc. ("Lexecon") and an economist at the University of Chicago Law School. At the immediately ensuing pretrial conference I disclosed (in conformity with the Code of Judicial Conduct) that although I do not know Professor Carlton I have had the following connections with Lexecon:

1. Before I joined this District Court in June 1980, my then law firm and I represented Lexecon and two of its three principals, then Professor (now Circuit Judge) Richard Posner and Andrew Rosenfield (a non-practicing lawyer now in his early thirties). Because both those principals were lawyers and because Lexecon's regular business affairs did not involve the need for outside legal representation, what my law firm and I did for Lexecon was in discrete areas: formation of the corporation (done by others in the firm), obtaining an opinion from the ABA Committee on Professional Responsibility (handled by me) and negotiation of an office lease (also handled by me). My former firm no longer represents either Lexecon or its principals and has not done so for some time (because I have not kept in touch with either Lexecon or with the firm's activities, I do not know when the representation ceased).[1] Andrew Rosenfield is still a principal in Lexecon, and I assume Judge Posner is not.

2. Though I did not detail to the parties my representation of Andrew Rosenfield individually, the facts are that during my last two years in the practice of law that consisted of my devoting something under five hours to conferring with him about tax and estate planning matters. During the latter part of that period my then law firm was also involved in some services in connection with an art gallery his wife (who has independent assets) was setting up.

3. Maurice Rosenfield, father of Andrew and himself a non-practicing lawyer, has been and still is of counsel to my former law firm.

---

1. Even were my former firm's representation ongoing, it would not involve me. My interest in firm income did not of course embrace any services rendered after I left the firm and the practice of law.

4. Maurice Rosenfield and his wife Lois had established a number of family planning trusts many years ago,[2] under all of which Andrew and his brother were, and presumably still are, beneficiaries (either vested or contingent). In each instance Maurice Rosenfield and I were designated the original co-trustees. Andrew has no power to designate trustees, to draw down funds or to control the trusts' investment or management decisions. When I was appointed to the federal bench, consistent with the Code of Judicial Conduct I resigned all those trusteeships. Since that time I have had no knowledge of the trusts or any matters relating to them (with the exception of the collaterally-learned information referred to in Paragraph 5), and I do not know the identity of the present Trustee or Trustees (save that Maurice presumably is still serving, and under the trusts' provisions Andrew cannot now be serving, in that capacity).

5. Both the Rosenfield family trusts referred to in Paragraph 4 (not Andrew individually) and I hold separate investments as limited partners in two limited partnerships. Under those partnerships the law requires (and the facts are) that the limited partners play no part in management at all. Like corporations, the limited partnerships are investment vehicles (indeed the *voting* rights of corporate shareholders are greater than any voting rights of the limited partners). In each instance I (or my wife and I collectively) own something less than a 2% interest in the investment limited partnership, while the Rosenfield family trusts hold a larger, but also minority, interest.[3]

Shortly after the pretrial conference M.K. asked that I consider possible recusal. Then the parties requested deferral of the question while they negotiated a possible settlement. Now those discussions have not borne fruit, and M.K. has renewed its request for recusal.

### Standards for Recusal

Section 455 defines the criteria for disqualification of judges. M.K. does not assert (nor could it) any of the specific grounds for recusal enumerated in Section 455(b) apply here. For example, I certainly have no "financial interest in the subject matter in controversy," nor do I have "any other interest that could be substantially affected by the outcome of the proceeding" (Section 455(b)(4)). M.K.'s request for recusal is novel because it invokes my relationship to a witness rather than a party. Thus any "interest" I even arguably have is extremely attenuated: It is neither an interest "in the subject matter" nor one capable of being "substantially affected by the outcome."

Accordingly M.K. focuses its recusal argument on the catch-all language of Section 455(a), which reads in its entirety:

> Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

Because Section 455(a) contains an objective standard, the issue is controlled neither by my own view of my ability to preside impartially over the case nor by the fact that M.K.'s principal has questioned my impartiality. In either case my impartiality must have been questioned *reasonably*.

*In re United States*, 666 F.2d 690, 694 (1st Cir.1981) (citation omitted) states the competing policies in light of which my relationship to Lexecon must be considered:

> The first and most obvious policy is that courts must not only be, but must seem to be, free of bias or prejudice. To en-

---

**2.** Those trusts were planned and drafted for the senior Rosenfields by a different law firm.

**3.** Technically what is involved in one of the two situations is that a general partnership in which I have less than a 2% interest, and in which the Rosenfield family trusts have a majority interest, is itself a minority *limited* partner (approximately 23%, I believe) in the operating partnership. Thus my interest in the operating partnership is less than a $\frac{1}{2}\%$ interest as a limited partner.

sure that the proceedings appear to the public to be impartial and hence worthy of their confidence, the situation must be viewed through the eyes of the objective person. . . .

A second and less obvious policy is that a judge once having drawn a case should not recuse himself on an unsupported, irrational, or highly tenuous speculation; were he or she to do so, the price of maintaining the purity of appearance would be the power of litigants or third parties to exercise a negative veto over the assignment of judges.

It then goes on to define the applicable objective standard (*id.* at 695, citation omitted, emphasis in original):

[D]isqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a *reasonable basis* for doubting the judge's impartiality. Were less required, a judge could abdicate in difficult cases at the mere sound of controversy or a litigant could avoid adverse decisions by alleging the slightest of factual bases for bias. . . . This restricted mandate to disqualify is calculated to induce a judge to tread the narrow path between timidity and tenacity.

To evaluate the asserted grounds for recusal, I will examine each potential kind of bias I might conceivably harbor as a result of the relationship already described and ask whether that possibility would concern a reasonable person. Sources of potential bias that might concern M.K. comprise

(1) fiduciary loyalty to Lexecon and its principals,

(2) financial interest in Lexecon or its principals and

(3) friendship with Lexecon's principals.

### 1. *Fiduciary Loyalty*

■ All my legal representation of Lexecon and its principals, as well as my co-trusteeship of the trusts of which Andrew Rosenfield was a beneficiary, terminated over four years ago. Those matters do not separately or collectively present a realistic threat or appearance of partiality. See *S.J.*

*Groves & Sons v. International Brotherhood of Teamsters, etc., Local 627,* 581 F.2d 1241, 1246–48 (7th Cir.1978). In fact those past involvements with Lexecon and its principals would not necessarily require recusal even if Lexecon were a *party* to a suit before me, so long as the suit did not pertain to the same subject matter as did the representation. See *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157, 1166 (5th Cir.1982). A fortiori an appearance by a Lexecon principal as a witness does not require recusal.

### 2. *Financial Interest*

■ Plainly I have no current financial stake in the financial well-being of Lexecon, any of its principals (such as Andrew Rosenfield) or any member of the immediate family of any of those principals (such as Maurice Rosenfield). My only present involvement with the Rosenfields' finances is the ownership of two investments in limited partnerships in which the Rosenfield family trusts also hold investments.

Even assuming my handling of this case will have an effect on the Rosenfields' finances (a tenuous assumption examined in greater detail below), no such effect could alter my own position in those partnerships. We are not, in any meaningful sense of the term, business partners such that an improvement in the Rosenfields' financial position could conceivably impact my own. Absent any financial interest whatever on my part in Lexecon or the Rosenfields, no legal discussion is necessary as to what types of financial interests would be impermissible.

### 3. *Friendship*

■ Of course I am friendly toward Andrew Rosenfield. While in private practice I worked closely with Andrew's father Maurice for many years and served as a trustee for the Rosenfield family trusts, of which Andrew was a beneficiary. During the summer I see the senior Rosenfields regularly as part of the crowd attending the Ravinia concerts, and on occasion we

are guests at the same social function.[4] Although I see Andrew much less frequently, both he and his then Lexecon colleague Professor (now Judge) Richard Posner were my clients at one time. On that basis M.K. argues not that I will promote my own self-interest in this litigation, but rather that I may confer indirect benefits on National's expert witness out of a sense of obligation to do good to my friends.

To my knowledge every federal court faced with arguments for recusal based on friendship has found recusal unnecessary. For example *In re United States* rejected the contention a district judge could not try a criminal defendant because that defendant had once done a favor for a close friend of the judge. As the Court of Appeals stated (666 F.2d at 696):

> Even, however, if one may assume the survival of some residue of gratitude after [15 years] ..., it is beyond contemplation that such gratitude would be of the weight necessary to cause a judge to jettison his impartiality and, in open court day after day, to violate his deepest professional and ethical commitments as a judge.

It then explained why friendships and favors cannot serve as the basis for recusal (*id.* at 696–97):

> If the receipt by a judge's friend of a favor long ago from one who is a present litigant should disqualify the judge, judges could hope to preside without challenge solely in communities in which they are strangers. For when a judge presides in an area where he and his family have lived for one or more generations, the numbers of people who have, directly or indirectly, helped family members, relatives, close friends, and friends of friends would form a large and indeterminate community. So also are there bound to be indefinite numbers of people

who have been critical of or been on opposite sides of controversies with families, relatives, and friends. Not only would the role of judges be severely constricted by requiring disqualification under these circumstances but the result would reflect a more jaundiced view as to when there should be a reasonable doubt about a judge's impartiality than accords with the public perception.

See also *Parrish v. Board of Commissioners*, 524 F.2d 98, 102 (5th Cir.1975), and cases cited therein.

Even were it assumed friendship could provide a basis for recusal, any connection between Andrew's well-being and the credibility I might attach to Professor Carlton's testimony is far too attenuated to be cognizable in the current analysis.[5] M.K. argued for recusal based on that connection (January 17, 1984 Letter at 2):

> Lexecon's principal business activity is providing expert testimony in lawsuits such as this one. Its financial well-being (and, hence, the financial well-being of its owners) is plainly intimately related to its ability to persuade courts and juries of the rightness of the expert opinion testimony (as opposed to fact testimony) its owners give.

But stating the nature of Andrew's stake in the trial does not go far enough. M.K. also must indicate why it is reasonable to be concerned about my partiality as a result.

Apparently M.K.'s scenario contemplates that if Lexecon's witness were discredited by a jury in this case, other customers may leave or may fail to come to Lexecon in the first place. If Lexecon has fewer customers, Andrew's total income will drop or he will be forced to rely more heavily on other sources. M.K. apparently fears that to prevent such a result I will conduct myself in such a way that the jury believes I credit

---

**4.** While on the subject of family friendship, I should add that my wife and I were among those making up the large guest list at Andrew's wedding several years ago.

**5.** Indeed any arguable connecting thread is even more finespun than the text would indicate.

This is a jury case, so the ultimate judgment as to the witness' credibility would not be mine. But to the extent the testimony bore on legal rather than factual issues, or evidentiary rulings were called for, my own decisions *could* be implicated.

Professor Carlton's testimony, and that I will make evidentiary rulings with an eye toward presentation of that evidence in a favorable light.

Simply to state that concern discloses its objective unreasonableness, and no extended discussion should be required. Nonetheless, because it is M.K.'s most strongly presented argument for recusal, it may be appropriate to examine some persuasive precedent in the case law.

*Chitimacha Tribe,* 690 F.2d at 1166–67 considered and rejected an asserted fear of partiality similar to M.K.'s here. There plaintiffs argued on appeal that the district judge himself (not just his friend) would profit from a judgment in favor of one of the defendants (Texaco, Inc.) because he had a present investment interest in his former law firm, which occasionally provided legal services to that defendant. *Chitimacha Tribe,* 690 F.2d at 1166–67 characterized plaintiffs' argument:

> The Chitimachas assert that if Texaco suffers in this suit, the judge's former lawfirm might suffer indirectly. Texaco might suffer such an overwhelming financial loss that it will no longer be able to employ the judge's former firm. As a result, the firm will have less income and could be forced to cut back on the periodic payments it makes to the judge.

Instead of crediting that argument with serious analysis the court simply stated (*id.* at 1167):

> At best, this speculation is remote and unrealistic. It does not justify disqualification.

While of course *Chitimacha Tribe* can be distinguished, the distinguishing factors really cut against rather than for M.K.'s position. Plaintiffs' argument for recusal there was actually stronger than M.K.'s here in two respects:

1. In *Chitimacha Tribe* the district judge was assertedly connected to a *party* through a third party (his former law firm); here I am assertedly connected to a *witness* through a third party (Lexe-con). While the judge in *Chitimacha Tribe* could provide a direct and material benefit to the entity with which he supposedly was associated, I cannot affect Lexecon except through the operation of some "seamless web" theory of societal interrelationship.

2. *Chitimacha Tribe* was really a financial interest case, not a friendship case, because plaintiffs argued there was some possibility the judge himself would actually profit in some indirect way from his ruling. Here the worst an allegedly partial judge could do is to benefit his friends, not himself.

■ In short, friendship between judges and trial actors other than parties, untainted by any financial interests, should not generally justify recusal. Even if that rule were to be altered to include egregious cases of apparent partiality toward witnesses, this is not such a case. As for the actual witness, I do not know Professor Carlton. As for his employer, even were I to abandon my ethical responsibilities,[6] nothing I could do would help or hurt Andrew Rosenfield in any significant way. Accordingly any such questioning of my impartiality on M.K.'s part is simply not reasonable.

\* \* \*

■ So much then for the individual asserted sources of potential bias. And the calculus would be no different if those considerations are viewed "as a whole" rather than one at a time. As *Miller Industries v. Caterpillar Tractor Co.,* 516 F.Supp. 84, 87 (S.D.Ala.1980) put it:

> In determining the necessity for disqualification, all circumstances bearing upon it should be considered. But that does not mean that various circumstances, each insufficient standing alone, mandate sufficiency in totality. Under the factual situation here presented, holding that these various circumstances in combination require disqualification would be tantamount to holding that adding sever-

---

**6.** This kind of hypothetical assumption is offensive but, I suppose, necessary.

al zeroes together would produce something more than zero.

None of this Court's "connections" provides any foundation whatever for disqualification. Accordingly their sum total also provides no basis for recusal.

*Conclusion*

It must be remembered the propriety of recusal should be ascertained objectively, without reference either (1) to my perceptions of my own ability to maintain impartiality or (2) to the concerns of the parties—in each instance as opposed to the concerns of the hypothetical "reasonable man." M.K.'s counsel briefly strayed into the latter subject when he reported (January 17, 1984 Letter at 2):

> By way of background, I think it important to bring to the Court's attention that the principal officer of my client, Mr. Knezevich, is a naturalized citizen who came to the United States as a refugee from Yugoslavia. As a consequence, he has had first-hand familiarity with the Yugoslavian legal system which he believes to be unfair and not impartial. Therefore, he has sensitivity to matters of fairness which although perhaps not directly applicable to the circumstances at hand, nonetheless exists.

That statement prompts me to add a brief non-legal comment to this legal analysis.

It may be understandable Mr. Knezevich, having experienced a court system he believes to be unfair, was alarmed to receive a letter from me outlining my out-of-court connection (however attenuated) to a witness in this litigation. Perhaps in another justice system a litigant would learn of such matters only through unofficial channels (if at all)—and then in a less-than-open manner. That might trigger the assumption (perhaps justifiable) that the information received was only the "tip of the iceberg," and that in reality the judge was more closely connected to a litigant, perhaps having a direct financial interest in that litigant.

Here however no such assumption is justifiable. Our court system required, and

M.K. has received, not only full disclosure but also the careful consideration of M.K.'s request for recusal reflected in this opinion. Whether or not Mr. Knezevich agrees, that disclosure and consideration reflect the fairness, not the unfairness, of our justice system.

In any event, I am honor bound to preside at the trial of this case in a manner that both appears to be and is in fact impartial. *In re United States,* 666 F.2d at 694, 695 teaches our District Court's random assignment system should not be subverted by any granting of ill-founded disqualification motions. M.K.'s request for recusal is denied.